**BOURNS, INC. and Marlan E. Bourns, Plaintiffs-Appellants and Cross-Appellees,**

v.

**ALLEN–BRADLEY COMPANY et al., Defendants-Appellees and Cross-Appellants.**

**Nos. 72–1222, 72–1223.**

United States Court of Appeals, Seventh Circuit.

Argued April 5, 1973.

Decided June 14, 1973.

Rehearing En Banc Denied July 17, 1973.

Pell, Circuit Judge, filed an opinion concurring in part and dissenting in part.

**124**

Donald J. Simpson, Lewis T. Steadman, Chicago, Ill., Arthur H. Seidel, Milwaukee, Wis., Clemens Hufmann, Gerald Rose, Rolf O. Stadheim, Chicago, Ill., for Allen Bradley Co.

Clyde F. Willian, Chicago, Ill., for Bourns.

Before CLARK, Associate Justice,* and PELL and SPRECHER, Circuit Judges.

CLARK, Associate Justice.

Appellants Bourns, Inc. and Marlan E. Bourns challenge the District Court's application of the doctrine of collateral estoppel as applied in Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), to bar this patent infringement suit which was filed in the United States District Court for the Northern District of Illinois against Allen-Bradley Company et al., appellees. Appellants alleged infringement of their "leadscrew actuated potentiometer," Patent No. 2,777,926 (the '926 patent). Among the defenses appellees pleaded collateral estoppel based on the final judgment entered against appellants in Bourns, Inc. v. Dale Electronics Inc., 308 F.Supp. 501 (D.Neb.1969). After the Supreme Court handed down the Blonder-Tongue decision, appellees filed amended answers further alleging that appellants had voluntarily dismissed their appeal to the United States Court of Appeals for the Eighth Circuit on May 4, 1970, and moved for summary judgment. The District Court, 348 F. Supp. 554, granted appellees' motion, holding that Blonder-Tongue governed this case and that the Dale decision had invalidated all claims embraced in the '926 patent. We agree that Blonder-Tongue bars appellants from relitigating the patent claims explicitly invalidated in Dale, but reverse the judgment below insofar as it bars appellant from relitigating the remaining '926 claims.

1. *The Dale Judgment.*

In the Dale pleadings Bourns had alleged infringement on the basis of its patent generally, i. e., without singling out specific claims. Likewise, the defendants in Dale had counterclaimed for a declaration that the entire patent was invalid. However, the Dale judgment stated in relevant part:

"2. Claims 1, 2, 11, 14, 15, 16 and 20 of the United States Patent No. 2,777,926 are invalid * * * *

7. The Amended Complaint is dismissed with prejudice, and the Amended Counterclaim is sustained to the extent indicated."

The District Court here found the Dale judgment ambiguous in its application to the '926 claims not explicitly mentioned therein. On the basis of several isolated statements in the Dale opinion (e. g., ". . . the '926 patent is held

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation.

to be invalid.") it concluded that the *Dale* court intended to hold the entire patent invalid.

■ We disagree with the District Court's interpretation and conclude that *Dale* is binding only as to the claims specifically mentioned in its judgment. The opinion in that case begins: "Plaintiff relies upon claims 1, 2, 11, 14, 15, 16 and 20 of the '926 patent." Further down in the opening paragraph the opinion continues: "In determining the validity of the patent this Court must ascertain the essence and scope of the patent *as stated in the above-mentioned claims.*" (Emphasis added.) Still further in the opinion the court says: "Commencing with the history and progress of this application through the patent office as finally embodied in claims 1, 2, 11, 14, 15, 16 and 20, it provides some insight into the scope of the patent." And in the judgment the *Dale* court again sets out these claims as invalid. We think it clear from these references that where the court referred to the '926 patent as being invalid, it was referring only to those claims specifically designated at the outset and re-stated in the final judgment. As Professor Moore teaches:

> [A prior judgment] operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or contraverted *and upon the determination of which the initial judgment necessarily depended.* [Emphasis added.]

1B Moore's Federal Practice 3777 (2d ed. 1965); and, as Judge Learned Hand explained almost forty years before, ". . . [collateral] estoppel extends only to facts decided and necessary to the decision." Irving Nat. Bank v. Law, 10 F.2d 721, 724 (2 Cir. 1926). Since the *Dale* court's judgment by its terms did not depend on the invalidity of claims not specified in that judgment, appellants are not collaterally estopped from asserting the remaining claims of the '926 patent.

2. *Application of the Blonder-Tongue Collateral Estoppel Doctrine.*

■ Appellants also urge that collateral estoppel should not be applied to bar their raising the same patent claims that were declared invalid in *Dale.* They rely on the statement in *Blonder-Tongue* that "the patentee-plaintiff must be permitted to demonstrate, if he can, that he did not have 'a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time.'" 402 U.S. at 333, 91 S.Ct. at 1445. Appellants argue that they lacked an incentive to fully litigate in *Dale* due to (1) an alleged anti-patent bias of the Eighth Circuit, (2) the relative insignificance of the *Dale* suit, (3) new procedural advantages made available since *Dale* was begun, (4) the alleged greater hospitality of the Seventh Circuit toward patents, and (5) their reliance on the pre-*Blonder-Tongue* case of Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936), which required mutuality of estoppel. We need not pause to discuss these claims. They are fully answered by the District Court, which correctly noted that appellants themselves chose the Nebraska forum; that the *Dale* court applied Supreme Court standards of patent validity as enunciated in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); that the *Dale* litigation involved a potential recovery by appellants of approximately $1,000,000, and that "most if not all" of the evidence alleged by appellants to have been newly discovered was in existence and discoverable during the *Dale* litigation. The District Court concluded that appellants lost in *Dale* after a full and fair hearing and that the equities fully justify the application of collateral estoppel against them.

The District Court also concluded that the Supreme Court in *Blonder-Tongue* implicitly rejected reliance on its prior decision in Triplett v. Lowell, *supra,* as an adequate basis for avoiding the general rule fashioned in the later decision. *See* Monsanto Co. v. Dawson, Chemical

Co., 443 F.2d 1035 (5 Cir. 1971), cert. denied 405 U.S. 974, 92 S.Ct. 1191, 31 L.Ed.2d 248 (1972). We agree. The *Dale* litigation was pending for seven years in a jurisdiction with no backlog; the trial itself lasted six days and produced a transcript of 610 pages; and the potential recovery was over $1,000,000. Thus, appellants had ample incentive to litigate the case to the end. True, the Supreme Court held in *Triplett* that collateral estoppel did not preclude "relitigation of the validity of a patent claim previously held invalid in a suit against a different defendant." Triplett v. Lowell, *supra,* at 644 of 297 U.S., 56 S.Ct. 645. However, in overruling *Triplett,* the *Blonder-Tongue* Court did not see fit to rule prospectively, though it has so limited recent rulings in other contexts where retrospective application would work hardship and inequity. Phoenix v. Kolodziejski, 399 U.S. 204, 213–215, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Cipriano v. City of Houma, 395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). Indeed, it specifically commented that in the end the use of the collateral estoppel doctrine "will necessarily rest on the trial courts' sense of justice and equity." 402 U.S. at 334, 91 S.Ct. at 1445. The District Court has carefully appraised the justice and equity of applying the doctrine here and has held against appellants. We have examined the record and conclude that its findings are fully supported therein.

Appellants dispute that they had full and fair judicial resolution of their claims. They suggest that they abandoned the *Dale* appeal in reliance on the *Triplett* rule. It may be that in some situations reliance on *Triplett* should relieve a patentee from the consequences of the *Blonder-Tongue* decision's new collateral estoppel rules. But the circumstances surrounding the *Dale* litigation, particularly the large potential recovery and the time and effort already expended, convince us that appellants would have pursued their appeal regardless of the *Triplett* rule had they held

any reasonable expectation of ultimate success. Since appellants abandoned their appeal because they saw no reasonable chance of prevailing *on the merits,* we believe it equitable both as a general matter and specifically under the *Blonder-Tongue* decision to apply the estoppel rule established in that decision.

The judgment below is reversed insofar as it bars appellants from asserting the patent claims other than those explicitly declared invalid in the *Dale* judgment. In other respects the judgment is affirmed.

PELL, Circuit Judge (concurring in part and dissenting in part).

I concur in the majority opinion insofar as it reverses that part of the judgment of the district court which barred appellants from asserting patent claims other than those explicitly declared invalid in the *Dale* judgment. However, I respectfully dissent from the balance of the majority opinion.

In considering the contentions of the appellants that the judgment in the District Court of Nebraska does not collaterally estop them as to any claims of the patent asserted in the Northern District of Illinois, the following significant chronology should be kept in mind.

The decision in the *Dale* case, Bourns, Inc. v. Dale Electronics Incorporated, 308 F.Supp. 501 (D.Neb.1969), was handed down on December 29, 1969. The original decision of this court in University of Illinois Foundation v. Blonder-Tongue Laboratories, Inc., 422 F.2d 769 (7th Cir. 1970), was issued on February 13, 1970, and was modified on denial of rehearing on April 2, 1970.

The appellants dismissed their appeal from the *Dale* district court decision in the Eighth Circuit on May 4, 1970. The complaint which was the fountainhead of the present appeal was filed in the Northern District of Illinois on August 11, 1970.

The opinion in the *Blonder-Tongue* case in the United States Supreme Court, Blonder-Tongue Laboratories,

Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788, was handed down on May 3, 1971.

The Supreme Court in *Blonder-Tongue* overruled a precedent which had been on the books since 1936, Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L. Ed. 949 (1936). *Triplett* indicated that "the rules of the common law applicable to successive litigations concerning the same subject-matter" did not preclude "relitigation of the validity of a patent claim previously held invalid in a suit against a different defendant." 297 U. S. at 644, 56 S.Ct. at 648. This court in its original *Blonder-Tongue* opinion, while observing that it would seem sound judicial policy that the adjudication of a patent validity issue against the plaintiff in one action where it was a party would provide a defense in any other action by the plaintiff for infringement of the same patent, nevertheless stated, "That, however, is not the law in this field." 422 F.2d at 772.

In essence, the majority opinion in the present appeal concludes that the district court carefully appraised the justice and equity of applying the *Blonder-Tongue* doctrine to the present case and upon so doing reached a correct result. I cannot agree with the initial premise for, as I read the district court's opinion, it concluded that the "justice in this matter is pre-empted by the *Blonder-Tongue* decision itself," and plaintiffs' reliance on pre-*Blonder-Tongue* decisions when abandoning their appeal "is contrary to the holding of that controlling decision which abrogated the prior law."

I do not read the controlling case so broadly. I note the following significant passages in the opinion of the Court. "The broader question is whether it is any longer tenable to afford a litigant more than one *full and fair opportunity* for judicial resolution of the same issue." 402 U.S. at 328, 91 S.Ct. at 1442. "But the case before us involves neither *due process* nor 'offensive use' questions. Rather, it depends on the considerations weighing for and against permitting a patent holder to sue on his patent after it has once been held invalid following *opportunity for full and fair trial.*" 402 U.S. at 330, 91 S.Ct. at 1443. "Presumably he [the patentee] was prepared to litigate and to litigate to the finish against the defendant there involved." 402 U.S. at 332, 91 S.Ct. at 1444. "Rather, the patentee-plaintiff must be permitted to demonstrate, if he can, that he did not have '*a fair opportunity procedurally, substantively and evidentially* to pursue his claim the first time.' . . . This element in the estoppel decision will comprehend, we believe, the important concerns about the complexity of patent litigation and the posited hazard that the prior proceedings were seriously defective." 402 U.S. at 333, 91 S.Ct. at 1445. "'[T]he expense of defending a patent suit is often staggering to the small businessman.'" 402 U.S. at 334, 91 S. Ct. at 1445. (Emphases added.)

With further reference to the matter of expense if the *Triplett* rule were maintained, the Court observed the money expended in subsequent litigation could be put to better use, such as further research and development, and that subsequent defendants might determine it was preferable to pay royalties under a license rather than to incur the costs of litigation. 402 U.S. at 338, 91 S.Ct. 1434.

The Court also adverted to the fact that there would be some saving of judicial time "if even a few relatively lengthy patent suits may be fairly disposed of on pleas of estoppel." 402 U.S. at 348, 91 S.Ct. at 1453.

Finally, the Court, since the issue had not been ventilated below, remanded the cause so that, *inter alia,* the patentee could have the opportunity to demonstrate "why an estoppel should not be imposed in this case."

In sum, the Court in *Blonder-Tongue* did not, as the district court seems to have done, lay down a hard and fast rule.

Assuming *arguendo* that the Supreme Court intended the sweep of *Blonder-Tongue* to be sufficiently broad to encompass all litigation the purpose of which was to relitigate a patent issue which had already elsewhere been found wanting, irrespective of whether that litigation was initiated before or after the change of the law, then applying the rationale which produced *Blonder-Tongue,* as specifically referred to hereinbefore, in my opinion the plaintiffs should not be estopped in the present case. Obviously, of course, they might well have been estopped if the litigation had been started after the rendition of *Blonder-Tongue,* but that is not the posture of this case.

Theoretically, the plaintiffs had an opportunity for a full and fair judicial resolution of the issue in *Dale.* Certainly they had the opportunity for a *full* resolution. All they had to do was to continue expending the not inconsiderable money which would necessarily have been involved in briefing and arguing in the Eighth Circuit and then pursuing certiorari in the Supreme Court. They did not choose to do so for reasons which I find persuasive and which are outlined in the majority opinion. Pursuing the litigation, of course, would also have put Dale to considerable expense. The plaintiffs were not prepared to litigate to the finish against the defendant there involved for the reasons indicated. Nor is the cost rationale of *Blonder-Tongue* brought into full play here. This is no case of a small businessman being forced willy-nilly into a licensing agreement. The very names of the corporate defendants would indicate otherwise; in addition, the action below was brought as a class action, presumably with the intent of putting an end one way or the other to the validity of the claims. Plaintiffs by their dismissal and their filing of the broad-breadth subsequent action were travelling economy class, as to themselves, the judiciary of the Eighth Circuit, Dale, and, to some extent, their individual prospective infringer-opponents.

While the plaintiffs had the full opportunity adverted to in *Blonder-Tongue,* it seems clear to me that we are not able to say with certainty that the second prong of fairness was equally present. It is obvious that new counsel who came onto the scene subsequent to the district court decision in *Dale* did not think so. The decision to dismiss the appeal and to file elsewhere against the remaining alleged infringers was made in the forepart of the year 1970, apparently about the time that this court decided that it did not agree with the result which had been reached on the patent involved in *Blonder-Tongue* by a district court in the Eighth Circuit.

The decision was made during the same period of time and the same patent litigation climatic conditions which compelled the chief judge of a district court in the Eighth Circuit to observe in Woodstream Corp. v. Herter's, Inc., 312 F.Supp. 369, 370 (D.Minn.1970), modified, 446 F.2d 1142 (8th Cir. 1971), as follows:

"The courtrooms within the province of the Eighth Circuit Court of Appeals do not afford a congenial forum to the holder of a United States patent. A reading of the decided cases clearly reflects this. It is especially true since 1966 following the Supreme Court's expressions in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545. I can find no record of the Eighth Circuit Court of Appeals, upholding the validity of a patent since *Graham.* It did so sparingly before *Graham.*"

It may well be that all of the patent cases which happened to have been filed in the Eighth Circuit during the preceding decade were of a questionable variety and on that phase of the matter I do not comment. I do note, however, "the batting average" which competent counsel, relying on *Triplett,* must have taken into consideration. The same counsel could not have been unaware of the more favorable climate in the Seventh Circuit. See the discussion of the situation in the two circuits by this court in

Scam Instrument Corp. v. Control Data Corp., 458 F.2d 885, 888 n.4 (7th Cir. 1972), in which it is indicated that the Eighth Circuit did sustain the validity in part of a patent in 1971. This, however, was subsequent to *Blonder-Tongue*.

While the foregoing discussion was based on the *arguendo* assumption that *Blonder-Tongue* is retrospective, I do not think that it was so intended, nor that the Supreme Court would reach the result that it is. The district court in the present case, however, had no doubt, observing that the "Supreme Court could have softened the blow by ruling only prospectively in *Blonder-Tongue*, as it has done on several occasions." If the district court merely meant that the Supreme Court in handing down *Blonder-Tongue* could have specified that it was prospective only, I, of course, would have to agree. In so doing, however, I would also note that the Court did not specify that the change of the law was retrospective either. The issue simply was not reached, and I am at a loss for the basis of the confidence of expression of the district court that the decision was retrospective. If the district court meant that because collateral estoppel could be considered as a defense to the plaintiff's suit in *Blonder-Tongue* it must be always retrospective, which seemed to be a theory advanced by the defendants in oral argument, then I must certainly disagree with the result put forward by the district court. When new law is established or, more importantly, when existing law is changed, it always is retrospective as to the particular litigant who is unsuccessful. This is inherent, for courts do not customarily give advisory opinions. This is a far cry though from inferring that the decision is retrospective as to other litigants who were relying on the pre-existing law.

The tests for determining whether a "new" decision should be applied retrospectively have been the subject of judicial attention. Chief Justice Burger had occasion to advert to this facet of the law in Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 1467, 36 L.Ed.2d 151 (1973) in which it was stated:

"Claims that a particular holding of the Court should be applied retroactively .have been pressed on us frequently in recent years. Most often, we have been called upon to decide whether a decision defining new constitutional rights of a defendant in a criminal .case should be applied to convictions of others that predated the new constitutional development. *E. g.,* Robinson v. Neil, 409 U.S. 876 [93 S.Ct. 876, 35 L.Ed.2d 29] (1973); Adams v. Illinois, 405 U.S. 278 [92 S.Ct. 916, 31 L.Ed.2d 202] (1972); Desist v. United States, 394 U.S. 244 [89 S. Ct. 1030, 22 L.Ed.2d 248] (1969); Stovall v. Denno, 388 U.S. 293 [87 S. Ct. 1967, 18 L.Ed.2d 1199] (1967); Johnson v. New Jersey, 384 U.S. 719 [86 S.Ct. 1772, 16 L.Ed.2d 882] (1966); Tehan v. Shott, 382 U.S. 406 [86 S.Ct. 459, 15 L.Ed.2d 453] (1966); Linkletter v. Walker, 381 U. S. 618 [85 S.Ct. 1731, 14 L.Ed.2d 601] (1965). But 'in the last few decades, we have recognized the doctrine of non-retroactivity outside the criminal area many times, in both constitutional and nonconstitutional cases.' Chevron Oil Co. v. Huson, 404 U.S. 97, 106 [92 S.Ct. 349, 355, 30 L.Ed.2d 296] (1971); Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481 [88 S. Ct. 2224, 20 L.Ed.2d 1231] (1968); Simpson v. Union Oil Co., 377 U.S. 13 [84 S.Ct. 1051, 12 L.Ed.2d 98] (1964); England v. State Board of Medical Examiners, 375 U.S. 411 (84 S.Ct. 461, 11 L.Ed.2d 440] (1964). We have approved nonretroactive relief in civil litigation, relating, for example, to the validity of municipal financing founded upon electoral procedures later declared unconstitutional, Cipriano v. City of Houma, 395 U.S. 701, [89 S. Ct. 1897, 23 L.Ed.2d 647] (1969), and City of Phoenix, Arizona v. Kolodziejski, 399 U.S. 204 [90 S.Ct. 1990, 26 L.Ed.2d 523] (1970); or to the validity of elections for local officials held under possibly discriminatory voting

laws, Allen v. State Board of Elections, 393 U.S. 544 [89 S.Ct. 817, 22 L.Ed.2d 1] (1969). In each of these cases, the common request is that we reach back to disturb or to attach legal consequence to patterns of conduct premised either on unlawful statutes or on a different understanding of the controlling judge-made law than the rule that ultimately prevails."

Tests for determining retroactivity are set forth in Chevron Oil Co. v. Huson, 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971), as follows:

"In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, e.g., Hanover Shoe v. United Shoe Machinery Corp., supra, 393 U.S. at 496 [88 S.Ct., at 2233], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, e.g., Allen v. State Board of Elections, supra, 393 U.S. at 572 [89 S.Ct., at 835]. Second, it has been stressed that '[w]e must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' Linkletter v. Walker, supra, 381 U.S. at 629 [85 S.Ct., at 1738]. Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.' Cipriano v. City of Houma, supra, 395 U.S. at 706 [89 S.Ct. at 1900].

In an analogous situation this court recently considered the question in Bendix Corporation v. Balax, Inc., 471 F.2d 149 (7th Cir. 1972), and concluded that the holding in Lear, Inc. v. Adkins, 395 U.S. 653 (1969), should not be applied retroactively. Bendix has particular significance here because in Lear the Court held that a licensee is not estopped to interpose the invalidity of the licensed patent as a defense to an action by the patentee-licensor to enforce the license agreement. The Court expressly overruled its 1950 holding to the contrary. The venerability of Triplett was fourteen years greater.

Applying the tests of Chevron to the present case: (a) a new principle of law was established by overruling clear past precedent on which litigants not only may but did in fact rely; (b) since litigants who have instituted lawsuits in reliance upon Triplett prior to Blonder-Tongue must of necessity be relatively limited in numbers, retrospective application would scarcely seem to further the operation of the principle enunciated; and (c) there is an inherent inequitable result if the principle is applied retroactively with injustice being avoided by a holding of nonretroactivity.

It is to be noted that the Chevron test refers to a foreshadowing of the result but does so only in relation to the decision of a case of first impression. If "writing on the wall" is operative in the situation of a change of law also, then, although the Triplett rule may have been questioned by decisions and commentators, I am unaware of any clear-cut indication from the Supreme Court on which a lawyer could advise his client to the effect that Triplett would be overruled. "Rumblings," as the district court referred to foreshadowing, is a chimerical basis for advice to a commercial client who in the conduct of his affairs requires predictability of as great certitude as possible if he is not to be exposed to unexpected and undesired expensive litigation.

As to foreshadowing, the situation was analogous in Lear, upon which Judge Sprecher commented in Bendix, 471 F.2d at 156, as follows:

"In Lear, there was an express overruling of a past precedent. Although the Court noted that '[l]ong

before *Hazeltine* was decided, the estoppel doctrine had been so eroded that it could no longer be considered the "general rule"' (395 U.S. at 664, 89 S.Ct. at 1908), nevertheless in *Hazeltine* the Court characterized it as the general rule. Whether *Hazeltine* was 'clear past precedent' to the Supreme Court in 1971, the unqualified pronouncement in that case undoubtedly made the doctrine clear enough to parties relying upon it from 1950 to 1971." [Footnote omitted.]

If foreshadowing is pertinent in the change of law situation, then it would appear to me that the present case presents a stronger basis for finding no clear and compelling presaging of the change than in the *Lear* situation, where there had already been substantial erosion of the set-aside doctrine in 1950 at the time the rule was recognized as the general rule, although it was not actually set aside for another 19 years.

I have adverted to the matter of advice of counsel in the commercial field and, in ultimate analysis, I find that the most persuasive reason for not denying the plaintiffs here their full day in court. The reasons are more compelling than the ordinary deference to precedent stated by Justice Cardozo, "Adherence to precedent must . . . be the rule rather than the exception if litigants are to have faith in the even-handed administration of justice in the courts."[1]

The essentiality of definite predictability was recognized by Mr. Justice Frankfurter in his separate opinion in Monroe v. Pape, 365 U.S. 167, 221–222, 81 S.Ct. 473, 503, 5 L.Ed.2d 492 (1961), when, speaking of the civil rights case before the Court, he observed, "This is not an area of commercial law in which, presumably, individuals may have arranged their affairs in reliance on the expected stability of decision." Here the plaintiffs did arrange their affairs on what counsel justifiably could have

taken as well-established law, and they should not now suffer because of a subsequent change of that law.

The principle of continuance of adherence to precedent was overridden in its significance by policy factors deemed of greater importance in *Blonder-Tongue*. The resultant change of law, however, in my opinion, should not be controlling on the relatively narrow issue here involved in the situation of commitments made in reliance upon the prior law, which commitments were made prior to the change in the law.

---

1. The Nature of the Judicial Process 34 (1921).